

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00544-CV

———————————————

IN THE INTEREST OF A.W., M.B., AND J.B., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-745109-24

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant E.W. (Mother) appeals the trial court's judgment terminating her parental rights to her three children, A.W. (Anna), M.B. (Max), and J.B. (John).[1] In a single issue, Mother argues that the evidence was insufficient to support the best-interest finding. We will affirm.

## I. BACKGROUND

The Department of Family and Protective Services (the Department) opened an investigation related to Anna, Max, and John after it received a call with concerns about their living environment. The call raised concerns of domestic violence in the home, along with drug and alcohol use by the boys' father[2] and Mother. In addition, the boys' father allegedly threatened to kill both Mother and Anna. The Department was granted an order to investigate in August 2023, but the evidence presented shows that Christie Blue, the Department's investigator, began the investigation in early January 2024.

Blue was not able to locate Anna for several weeks. Anna was ultimately located at school and Max and John were turned over to the Department by their grandfather. During Blue's interviews with the children, they confirmed the parents' substance abuse

---

[1] We use aliases to identify the children involved, and we identify family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] The boys' father—whose rights were also terminated in this trial—was not Anna's biological father. Anna's biological father lives in Tennessee and Anna was placed with him during the removal from Mother's care.

and the threats from the boys' father against Mother and Anna. Blue testified that she attempted to speak with the boys' father while he was in a rehabilitation program, but staff told her that he was "not in a good spot" and needed some time. Mother also participated in rehabilitation for substance abuse—first for a fentanyl overdose and later for methamphetamine and alcohol abuse. Ultimately, the Department's disposition in the case against Mother was "reason to believe" for neglectful supervision, based on the children's outcries of domestic violence and the unsanitary state of the home.[3]

Rachel Nongard, the Our Community Our Kids (OCOK) permanency specialist, also testified. Nongard coordinated the placements for the children—Anna was placed with her biological father and Max and John were placed with their paternal cousin. All of the children were doing well in their respective placements and expressed a desire to remain there. The children also expressed—at least for a period of time during the case—that they did not want to visit with Mother.

In addition to attending scheduled visitation, Mother was also expected to engage with individual counseling services, attend parenting classes, complete a drug assessment, and complete a psychological evaluation. At the time of the trial, Nongard testified that Mother was no longer engaging in any services. Mother was living with a friend who did not want the Department in her home, preventing Nongard from

---

[3]Blue also testified that the apartment where Mother, the boys' father, and the children were living was deemed a hazardous place following the family's eviction.

assessing whether it was safe for the children. Ultimately, Nongard testified that Mother had not made progress towards sobriety.

Nongard testified that because the removal was related to Mother's substance abuse and domestic violence concerns, and because OCOK had made every effort to help Mother but she had not made enough progress to alleviate those concerns and threats of harm to the children, termination of Mother's parental rights was in the best interests of all three children.

## II. BEST-INTEREST FINDING

Mother challenges the trial court's best-interest finding. Mother argues that a parent's right to care for her child is "far more precious than any other property right" and that because a "middle ground" existed, termination was not in the best interest of the children. Mother claims that the trial court abused its discretion because it could have granted permanent managing conservatorship to the Department without terminating her parental rights.

### A. STANDARDS OF REVIEW AND APPLICABLE LAW

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce

in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-rights-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due

deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationships would be in the children's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *Id.* at 18–19.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

    (A)  the child's desires;

    (B)  the child's present and future emotional and physical needs;

    (C)  the present and future emotional and physical danger to the child;

    (D)  "the parental abilities of the individuals seeking custody";

(E)  "the programs available to assist these individuals to promote the [child's] best interest";

(F)  "the plans for the child by these individuals or by the agency seeking custody";

(G)  "the stability of the home or proposed placement";

(H)  the parent's acts or omissions that indicate "the existing parent–child relationship is not a proper one"; and

(I)  any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).  These factors are not exhaustive, and some listed factors may not apply to some cases.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

## B.  DISCUSSION

Without identifying any particular factor or evidence, Mother contends that "there was a middle ground for termination."  Mother argues that the Department could have had permanent managing conservatorship of the children without terminating her parental rights.  But Mother's argument overlooks the plethora of evidence presented to the trial court.

7

**1. The Children's Desires, Present and Future Emotional and
Physical Needs, Present and Future Emotional and
Physical Danger, Parenting Abilities, Plans for
the Children, and Stability of Placements**

The children were removed from Mother's care following allegations of drug abuse and domestic violence. In addition to the threats of violence against Mother and Anna by the boys' father, Mother reported that the boys' father had choked her—leading to his arrest—but that as of June 2024, she was not in contact with the boys' father.

Mother overdosed on fentanyl after the start of the case and was in and out of rehabilitation twice during the pendency of the case. Nongard testified that the children did not want to visit Mother during the case and did not wish to return to her care.

The family was evicted from the apartment they were living in around the time of the removal, and the apartment was so filthy it was deemed a hazardous place. The children told the investigator that the home was dirty and there was dog feces on the floor. Then later, Mother was living in a home the Department could not inspect to determine if it was safe, causing the Department to retain the same concerns that led to the children's removal.

The children were happy and thriving in their placements, and the Department's goal was for Anna's biological father to have permanent managing conservatorship and for Max and John to be adopted by their cousin. Anna was doing well in school, making friends and keeping her grades up to graduate early, while also working to save money

for a car. Max and John were settling in well and becoming more comfortable with the stability offered in their cousin's home. At the start of the placement, Max and John would hoard food, worried there would not be enough to eat. But that behavior had decreased, and the boys were becoming more confident in vocalizing their needs and feelings.

All of these factors weigh in favor of termination.

### 2. Programs Available, Parent's Acts or Omissions, and Excuses for Parent's Acts or Omissions

Mother failed to complete many of the requirements in her service plan. She did not complete the drug and alcohol use assessment and only participated in three of the eighteen drug tests requested by the Department. Two of those tests were negative and one could not be processed by the lab—by no fault of Mother's actions. These tests occurred in September, following her second stay in rehabilitation.

Mother was first in rehabilitation following a fentanyl overdose. She admitted to Nongard that almost immediately after her release from rehabilitation the first time, she relapsed with methamphetamine and alcohol use. Despite her enrollment in rehabilitation two times, because of her relapse and lack of participation in the substance abuse assessment, the Department still had concerns about her sobriety and the children's safety.

Although Mother did enroll in counseling, she did not consistently participate and had not completed the program at the time of the trial. The Department attempted

to provide cab vouchers for transportation and paid for services for Mother. In spite of those supports, Mother was not participating in any services at the time of trial.

Nongard was able to confirm that Mother had employment, but was not able to confirm stable, suitable housing for the children. The friend Mother was living with would not allow the Department to inspect the home. Because Mother has not taken the necessary steps to ensure the safety of the children—and despite the confirmation of employment, participation in counseling, and two negative drug tests—these factors also weigh in favor of termination.

### 3. Analysis

Considering all the best-interest factors, we conclude that the evidence is legally and factually sufficient to support the trial court's best-interest finding. When considered in light of Mother's acts and omissions, including her continued substance abuse and failure to provide a safe and stable environment for the future, the children's circumstances and desires at the time of trial—and the stability of their respective placements in the future—weighed heavily in favor of the trial court's finding that terminating Mother's parent–child relationships with the children was in their best interests. *See In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.) (noting that, as to future drug use, "a factfinder may measure a parent's future conduct by his past conduct"). Mother's drug use alone could constitute a danger to the children, particularly when there is also a threat of violence. *See In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *6

10

(Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) (holding that when the mother continued to use illegal drugs after she knew her parental rights were in danger, "she showed a voluntary, deliberate, and conscious course of conduct that, by its nature, endangered her children's well-being"); *see also In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) ("[A] child needs . . . parents who d[o] not use drugs.").

Having determined that the evidence is legally and factually sufficient to support the trial court's best-interest finding, we overrule Mother's best-interest challenge.

## III. CONCLUSION

Having overruled Mother's sole issue, we affirm the trial court's termination order.

/s/ Brian Walker

Brian Walker
Justice

Delivered: April 3, 2025

11